**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MISSOURI
WESTERN DIVISION**

GLEANICE BROWN,　　　　　　　　　)
LATRONDRA MOORE, and　　　　　)
TAMARA SOLOMON,　　　　　　　)
　　　　　　　　　　　　　　　　)
　　　　　Plaintiffs,　　　　　　)
　　　　　　　　　　　　　　　　)　　　　Case No. 4:20-CV-00920-DGK
v.　　　　　　　　　　　　　　　)
　　　　　　　　　　　　　　　　)
KANSAS CITY, MISSOURI BOARD　)
OF POLICE COMMISSIONERS, et al.,　)
　　　　　　　　　　　　　　　　)
　　　　　Defendants.　　　　　　)

## ORDER GRANTING BOARD OF POLICE COMMISSIONERS' MOTIONS FOR SUMMARY JUDGMENT

Plaintiffs are female African Americans who were formerly detectives in the Crimes Against Children Unit of the Kansas City, Missouri, Police Department ("KCPD"). They allege their immediate supervisors in the Crimes Against Children Unit discriminated against them based on their race, age, and gender, and the KCPD discriminated against them in how it punished them for various procedure and policy violations. Plaintiffs are suing Defendants under various federal civil rights laws for discrimination, retaliation, and harassment based on race, age, and gender.

Now before the Court are the Kansas City, Missouri Board of Police Commissioners and its members' (collectively "BOPC") motions for summary judgment. ECF Nos. 122 (Plaintiff Gleanice Brown), 123 (Plaintiff Latrondra Moore), and 124 (Plaintiff Tamara Solomon). The record suggests almost all of the detectives in the Crimes Against Children Unit—including Plaintiffs and their white male colleagues—were chronically overworked and so potentially unfairly disciplined for failing to clear cases in a timely fashion. But there is no evidence that

Plaintiffs' race, age,[1] or sex played a role in how they were treated.   Accordingly, the BOPC's motions for summary judgment are GRANTED.

## Summary Judgment Standard

Summary judgment is appropriate if, viewing all facts in the light most favorable to the nonmoving party, there is no genuine dispute as to any material fact, and the moving party is entitled to judgment as a matter of law.   Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986).   Material facts are those facts "that might affect the outcome of the suit under the governing law," and a genuine dispute over material facts is one "such that a reasonable jury could return a verdict for the nonmoving party."   *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).   The party seeking summary judgment bears the burden of showing a lack of a genuine dispute as to any material fact, *Celotex Corp.*, 477 U.S. at 323, and the Court views the facts in the light most favorable to the nonmoving party, drawing all reasonable inferences in that party's favor, *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 588–89 (1986). To survive a motion for summary judgment, the nonmoving party must substantiate her allegations with "sufficient probative evidence that would permit a finding in her favor based on more than mere speculation, conjecture, or fantasy."   *Mann v. Yarnell*, 497 F.3d 822, 825 (8th Cir. 2007) (quotation omitted).

## Undisputed Material Facts

To resolve the motions, the Court must first determine the material undisputed facts.   They are set forth below.   The Court has limited the facts to those that are undisputed and material to the pending summary judgment motions.[2]   *See* Fed. R. Civ. P. 56(c); L.R. 56.1(a).   The Court

---

[1] Plaintiff Gleanice Brown is the only Plaintiff asserting an age-discrimination claim.

[2] For example, many of Plaintiffs' proposed facts are immaterial to resolution of the pending summary judgment motions, such as the details of the KCPD's unmanageably high caseload for the Crimes Against Children Unit.

2

has excluded legal conclusions, argument presented as fact, proposed facts not properly supported by the record or admissible evidence,[3] or proposed facts not supported by citation to particular parts of the record.  *See* Fed. R. Civ. P. 56(c); L.R. 56.1(a).  It has included proposed material facts which have been improperly controverted.[4]  *See* Fed. R. Civ. P. 56(c); L.R. 56.1(a).

This long factual section is broken into three parts.  The first part sets out facts which are

---

[3] For example, Plaintiffs repeatedly assert that they were treated differently in similar cases with similar policy violations, but Plaintiffs cannot identify a single specific case with similar policy violations.  *See*, *e.g.*, Pls.' proposed fact 165; ECF No. 143 ("Black female detectives were punished more severely and received more policy violations for failure to investigate the case or properly document investigative activity in a timely manner than their white male counterparts.").  But the cited portion of the record does not support this assertion, and a proposed fact cannot be based on speculation.  Plaintiffs also attempt to support conclusory facts regarding their alleged disparate treatment based on their own deposition testimony.  *See*, *e.g.*, Pls.' proposed facts 127–28 ("Similarly situated white and male detectives were not punished for violating the same policies as the black female detectives." and "Brown and the other black female detectives frequently worked longer hours than their Caucasian male counterparts.").  This is not proper evidence under Rule 56 to support such proposed facts.  *Thomas v. Corwin*, 483 F.3d 516, 530 (8th Cir. 2017) (holding a plaintiff's "own conclusory allegations . . . unsupported with specific facts or evidence" is "insufficient to create a genuine issue of fact so as to preclude summary judgment.").

[4] For example, Plaintiffs attempt to controvert the BOPC's statement of fact 84, "The Review Panel made its recommendations based solely on its own review and discussion," by citing the deposition testimony of Major Diane Mozzicato on page thirty-two, lines one through twenty-two, claiming "Mozzicato admitted to being influence[d] by outside sources like the Kansas City Star Articles."  Resp. at 29, ECF No. 143.  In fact, the testimony cited by Plaintiffs says no such thing.  If anything, it suggests the opposite is true:

| 1 | Q. | Do you have any knowledge about Jean Peters Baker's |
| 2 | | involvement with the Crimes Against Children's Unit? |
| 3 | A. | I don't know what you mean by knowledge. |
| 4 | Q. | Do you have any personal knowledge? |
| 5 | A. | Again, I don't know what you mean by personal |
| 6 | | knowledge. |
| 7 | Q. | From your memory, your recollection? |
| 8 | A. | Just what was in the papers. |
| 9 | Q. | What do you mean by what was in the paper? |
| 10 | A. | I believe she's -- I don't remember the article, I'm |
| 11 | | sorry.  Something regarding letters or something along |
| 12 | | that line. |
| 13 | Q. | You read articles about the Crimes Against Children's |
| 14 | | Unit? |
| 15 | A. | If I said no I would be lying.  I know I probably read |
| 16 | | a article about it. |
| 17 | Q. | Was this before or after you were involved in the |
| 18 | | review committee? |
| 19 | A. | That I don't know. |
| 20 | Q. | Did these articles that you read did they influence |
| 21 | | your opinion over the Crimes Against Children's Unit? |
| 22 | A. | No. |

Mozzicato Dep., ECF No. 129-51 (emphasis added).

3

common to all three Plaintiffs' claims in chronological order. The second part focuses on facts relevant to each Plaintiffs' claims and may not be in chronological order. The third part is very brief and explains the EEOC charges. To aid the reader, headings are used throughout.

## I. Facts Common to All Plaintiffs

### Events Leading to Seward Team Review

In mid-September 2015, Major David Lindaman ("Maj. Lindaman") wrote a memo to his superior officer in the KCPD, Deputy Chief Cheryl Rose, stating that in mid-September of 2015, he learned that Jackson County Prosecutor Jean Peters Baker ("Baker") was concerned about the timeliness of cases being delivered to her office by the KCPD Crimes Against Children ("CAC") Unit for charging decisions. Baker believed that the issue was largely unit wide.

About that same time, on September 13, 2015, Baker emailed Captain Todd Paulson ("Capt. Paulson") and Maj. Lindaman about a recent telephone call she had with Plaintiff Solomon, who was then a detective in the CAC Unit. Baker wrote:

> [A] 7 year old was grazed by a bullet last night after two male individuals were arguing. Naturally, I contacted my office this morning to see the status of the case assuming it was being worked. After a series of phone calls to each on-call prosecutor, none were made aware of this case. No one knew anything about it. I asked MY staff to contact your staff to find out where the case was at and how we can assist in putting a case together – still assuming the case was being worked. Our on-call secretary told me Det. Solomon had the case, but she was less than happy to receive her call and our inquiry about it. Solomon was described as openly hostile to my staff. I asked for her number and, of course, I called her. Det. Solomon's response to my inquiries were disturbing. She was annoyed that I was calling. She asked me if I wanted her to put a pick up out for an unknown male. I thought that seemed silly since the mother of [the] child should have some information to provide us and the father of the child is known to us. Det. Solomon stated the mother had called the ther [sic] over last night – so she should have some knowledge of how to find the FATHER. Seems like a

4

place to start. ONLY after I pushed did she make some overtures
to put a case together. I find this unacceptable.

What became clear is that I will NEVER get this case. A seven
year old was injured, but no investigation is going to be done. Det.
Soloman [sic] said the child would be sent to the CPC for a forensic
interview. After the child is back home – perhaps with those
responsible for his injury, I don't really see that as a great
investigative tool. Why are we waiting? Why didn't we ask for
the name and phone number of the father? If we did, why aren't
we trying to find him? If I had not called this morning, this case
would never go anywhere – and this 7 year old is just as screwed
today as he was yesterday.

[…]

Disclaimer: I am violating my long-standing policy of sending an
email while still angry, but a seven year old child is the VICTIM
and we have lost precious time.

Baker described her interaction with Solomon as "particularly alarming."

For several years leading up to this time, the CAC Unit had been inadequately staffed,
trained, and supervised. Detectives in the CAC Unit typically had a larger caseload compared to
other units. The CAC Unit's cases took more time to investigate because CAC detectives had to
work with so many outside entities, and they had more responsibilities than detectives in other
units. The chain of command had been aware of the staffing issue since at least 2012.[5]

In response to Baker's letter, on September 14, 2015, Maj. Lindaman directed Sergeant
Mike Seward ("Sgt. Seward") and four detectives (Det. Sarah Throckmorton, Det. Tim Perry, Det.

---

[5] Many of Plaintiffs' 656 proposed facts concern problems related to staffing levels in the CAC Unit and the chain of
command's alleged blame shifting and indifference to these problems. While these proposed facts suggest the CAC
Unit was poorly managed and all the detectives who were subsequently disciplined may have been placed in a "no-
win" situation, these proposed facts do not show that any detective's race, age, or sex played a role in the disciplinary
process, or that Plaintiffs were retaliated against for engaging in protected activity. Hence, the details in many of
these proposed facts have been excluded.

William Dillingham, and Det. Keith Huntington) to conduct a "backlog review" of assigned cases in the CAC Unit that were older than six months.   During the backlog review, Sgt. Seward began to investigate the cases for investigative flaws and began interviewing people about perceived problems with the CAC Unit.

Maj. Lindaman directed the backlog review team to "identify, quantify and qualify all cases more than six months old," and then work up these cases for prosecution.   On October 30, 2015, Sgt. Seward prepared a summary memo and spreadsheet to Capt. Paulson listing approximately 150 CAC cases that he and his team had identified as having deficiencies.   The table below lists the number of cases identified in Sgt. Seward's memo, along with the CAC squad members' tenure, race, sex, and number of cases deemed to have deficiencies.

| CAC Squad Member | Tenure in CAC (whole years as of Oct. 2015) | Race | Sex | Number of cases with deficiencies |
|---|---|---|---|---|
| Det. Will Majors | 5 | W | M | 0 |
| Sgt. Roy Murry | 9 | W | M | 1 |
| Det. James Foushee | 9 | W | M | 10 |
| Det. Travis Menuey | Less than 1 | W | M | 15 |
| Det. Gleanice Brown | 16 | B | F | 21 |
| Det. Latrondra Moore | 8 | B | F | 21 |
| Det. Robert Roubal | 7 | W | M | 24 |
| Det. Amy Klug | 2 | W | F | 25 |
| Det. Tamara Solomon | 3 | B | F | 31 |

On November 11, 2015, Sgt. Seward submitted a supplemental report which identified an

additional nine cases with deficiencies that were closed out in September 2015 and had therefore not been reported to Paulson as part of the closing out backlogged cases. Plaintiff Moore had been assigned one of these cases. Plaintiff Brown had been assigned the other eight.

### Initiation of the Miscellaneous Investigation into the CAC Unit

Following Maj. Lindaman's receipt of Sgt. Seward's memo and his review of the underlying information, Maj. Lindaman recommended that the Chief of Police authorize a Miscellaneous Investigation to be conducted by the Internal Affairs Unit ("IAU"). Maj. Lindaman wrote that Sgt. Seward's memo appeared to reveal "a systemic failure of an entire element," and further suggested that this failure was due to the behaviors of "seven of the eight assigned detectives" who apparently "failed to hold themselves accountable," as well as the organization "failing to ensure adequate accountability measures were in place." He also wrote that a Violent Crimes Division ("VCD") led investigation would be inappropriate as VCD (where the CAC Unit is located inside the KCPD's structure) was not capable of handling an investigation of this scale, and further that it was "likely the VCD supervisors and commanders (myself included) are in some degree responsible for allowing this organizational failure to develop over the past four years."

On December 21, 2015, Deputy Chief Cheryl Rose concurred with Maj. Lindaman's request to initiate a Miscellaneous Investigation "due to the seriousness of this issue." On December 23, 2015, then Chief of Police Darryl Forte approved the Miscellaneous Investigation. On January 4, 2016, IAU opened a Miscellaneous Investigation and assigned it to Detectives Mike Curley and James Sola.

7

**CAC Members Suspended**

On January 28, 2016, at the recommendation of Maj. Lindaman and with the approval of Chief Forte, almost all CAC squad members were suspended with pay. Maj. Lindaman recommended this action because of "new developments" that led him to believe "the retaining of the detectives and involved supervisors was not in the best interest of the department as it is impossible to assure the public these detectives can be trusted to conduct themselves professionally until a thorough internal investigation is completed." The CAC squad members suspended were Sgt. Roy Murry; Sgt. Jonathan Hess; Det. Robert Roubal; Det. James Foushee; Det. Travis Menuey; Det. Amy Klug; Det. Tamara Solomon (a Plaintiff); Det. Gleanice Brown (a Plaintiff); and Det. Latrondra Moore (a Plaintiff). The only CAC squad member not suspended was Detective Will Majors, whose cases Sgt. Seward's team determined had no deficiencies.

On February 7, 2016, Chief Forte reinstated the suspended CAC Unit members, but reassigned them from the CAC Unit to various Patrol Bureau division stations. Det. Majors remained in the CAC Unit.

Despite the KCPD's efforts to shield this information from disclosure to others, the Jackson County Circuit Court subsequently ordered this information be provided to the Jackson County Prosecutor's Office.

**Media Leaks**

There is no evidence that anyone at the KCPD ever leaked information to the media to discriminate against Plaintiffs.

**The CAC Unit Miscellaneous Investigation**

For the Miscellaneous Investigation, IAU reviewed materials and interviewed several individuals involved with the CAC Unit. During the investigation, media coverage identified all

the suspended detectives by name.

On August 16, 2017, the BOPC and Fraternal Order of Police Lodges No. 99 and 102 ("FOP") negotiated and executed a Letter of Understanding to employ "specialized procedures" for the administrative review of the Miscellaneous Investigation case file.

The BOPC and FOP agreed that a panel of five department members ("the Review Panel") would be assigned in a full-time capacity to conduct the administrative review of the CAC investigation for the purpose of summarizing the results of the investigation and, when appropriate, to prepare factual summaries and Personnel Incident Reports ("PIR") outlining specific policy violations committed by department members. The BOPC and FOP further agreed that any factual summaries and PIRs completed would be "a collaborative effort of the panel," signed by the highest-ranking member of the panel, who was also tasked with meeting with and presenting the summary and PIR to the affected department member(s).

The BOPC and FOP agreed to the appointment of the following Review Panel members: Major Diane Mozzicato (white female, born 1960), Captain Terry Freed (white male, born 1972), Sergeant Jeff Downing (white male, born 1973), Sergeant Luther Young (black male, born 1984), and Detective Erica Oldham (white female, born 1979).

**Review Panel Action**

The Review Panel began reviewing materials around September 2017. Maj. Mozzicato testified the Review Panel took "painstaking efforts to um vet this out to the best of our abilities to determine what occurred." The Review Panel members spent all their time, every day, reviewing the materials from the IAU investigation. Among the materials reviewed by the Review Panel were the memorandums and spreadsheets prepared by Sgt. Seward and the witness statements. It also reviewed IAU materials from roughly September 2017 to January 2018, and

9

subsequently began vetting that material. The Review Panel did this after reviewing detectives' statements to IAU that referred to mitigating circumstances.

The Review Panel's members believed they did not have enough information to validate the existence of the mitigating circumstances. So, they researched some of those areas as much as they could to re-create and understand the conditions under which the detectives were working. The Review Panel relied on Sgt. Seward's documents for the case report numbers and on what Internal Affairs gave them as far as the case report numbers. But they also "drilled down" to look at the raw data—what was in various departmental files and what had been scanned into Tiburon (an infrequently used computerized case-management system) to determine the totality of the work performed when cases were assigned to a particular detective.

Plaintiffs believe the Review Panel did not take Moore and Brown's mitigating circumstances into consideration.

After reviewing the investigative materials compiled by IAU and the information in various files and computer systems, the Review Panel identified violations of KCPD policy using department procedural instructions, personnel policies, and duty manual directives. For each member the Review Panel determined violated policy, the Review Panel prepared a PIR and factual summary of the violations found and presented these to the member. The Review Panel determined that policy violations had occurred regarding the actions of seventeen department members.

Plaintiffs contend the Review Panel did not list every policy violation a CAC detective committed, but only identified the policy violation they wanted to apply to each member. Plaintiffs have not supported these assertions with evidence the Court can consider at summary judgment.

10

Four of these seventeen department members were no longer active members of the department on the date the Review Panel completed its factual summary and PIR. The Review Panel did not present the inactive members with the factual summary and PIR, the inactive members provided no response to the policy violation allegations, and the Review Panel recommended no disciplinary action for them. The four inactive members included three retired commanders and one former CAC detective.

Each active department member who was presented with a factual summary and PIR was given time to review the investigative file and provide a response. Each Plaintiff was presented a factual summary and provided a response. Several CAC personnel also provided a joint response.

The Review Panel considered each response and whether the policy violations should be removed. The Review Panel then jointly determined what recommendations to make to the Chief of Police regarding the corrective action they believed was warranted for a particular person. The Review Panel made its recommendations based solely on its own review and discussion.

The Review Panel conducted a group discussion and then made a recommendation based on the facts they found for that individual. Sometimes the Review Panel spent days discussing the recommendation for one person. The Review Panel believed each individual's case was different, and it believed its decision with respect to each individual was based on all the facts, including mitigating factors, that were present. Factors considered included each individual's tenure and training while in the CAC Unit, the severity of the deficiencies found in the case files, whether there was a suspect identified in the case file, the quantity of cases found with deficiencies assigned to a particular detective, the statements made by the detectives explaining the deficiencies found in their files, whether the detectives had taken actions to close out cases to avoid detection,

11

whether deception appeared to have occurred, and property found in the desks of the detective. Mitigating circumstances differed from detective to detective and included things like a member's assignment to the Baby Lisa task force; a member's role as the primary training detective; the fact that Plaintiff Solomon was on limited duty/leave for a portion of her CAC assignment and was assigned a disproportionately high number of cases; etc.

The following table shows the members for whom the Review Panel prepared a factual summary and PIR (in order of highest rank), as well as the action taken.

| Rank | Name | Race | Gender | Action Taken | Employment Status/ Time in CAC Unit |
|------|------|------|--------|--------------|-------------------------------------|
| Deputy Chief | Randall Hundley | B | M | Policy violations found; no action recommended | Retired / Active Time Over CAC 2011 – 2013 |
| Deputy Chief | Randy Hopkins | B | M | Policy violations found; no action recommended | Retired / Time Over CAC 2013 – 2014 |
| Major | David Lindaman | W | M | 3 days suspension had member not retired | Retired / Time Over CAC 2015 – 2017 |
| Captain | Sondra Zink-Groves | W | F | Disciplinary Counseling | Active / Time Over CAC 2016 – 2016 |
| Captain | Michael Hicks | W | M | Disciplinary Counseling | Active / Time Over CAC 2005 – 2008 |
| Captain | Todd Paulson | W | M | 10 days suspension (Grievance filed and 10-day | Active / Time Over CAC 2014 – 2016 |

| | | | | suspension upheld) | |
|---|---|---|---|---|---|
| Sergeant | Michael Seward | W | M | No action recommended | Retired 10-29-2017 Time Over CAC 2015 – 2016 |
| Sergeant | Jonathan Hess | W | M | 10 days suspension. (Grievance filed, Grievance Committee recommended 5 days suspension. Chief of Police upheld original 10-day suspension) | CAC squad supervisor 2013 – 2015 |
| Sergeant | Roy Murry | W | M | Termination had member not retired | Retired 11-24-2018 / CAC squad supervisor 2008 – 2016 |
| Detective | Robert Roubal | W | M | 1 day suspension | CAC training detective 2010 – 2016 |
| Detective | James Foushee | W | M | Letter of reprimand | CAC 2013 – 2016 |
| Detective | Steffan Roetheli | U | M | Disciplinary Counseling | CAC 2006 – 2012 |
| Detective | Travis Menuey | W | M | Disciplinary Counseling | CAC 2015 – 2016 |
| Detective | **Tamara Solomon** | B | F | 7 days suspension and involuntary transfer to Patrol Bureau | CAC 2015 – 2016 |

| Detective | Amy Klug | W | F | No action recommended | Resigned on 11-27-2017 |
|-----------|----------|---|---|----------------------|------------------------|
| Detective | **Gleanice Brown** | B | F | Termination had member not retired | Retired / CAC 2010 – 2016 |
| Detective | **Latrondra Moore** | B | F | 12 days suspension and involuntary transfer to Patrol Bureau | CAC 2008 – 2016 |

Finally, all the detectives that had worked in the CAC Unit since 2014 received unsatisfactory reviews for 2016.

**Final Action**

In late October 2018, the Review Panel submitted the packets of the above seventeen department members to then Chief of Police Richard Smith for final determination. Six of these individuals held a rank of captain or higher.

With respect to the Plaintiffs, on October 22, 2018, the Review Panel recommended that Moore receive a twelve-day suspension, Solomon receive a seven-day suspension, and Brown be terminated.

Plaintiffs state this is when they "realized the KCPD specifically targeted and discriminated against" them.

Chief Smith, in consultation with Executive Officer Major Mark Francisco ("Maj. Francisco"), agreed with the Review Panel's recommendations, and on December 26, 2018, Chief Smith signed Moore and Solomon's PIRs. In consultation with Maj. Francisco, Chief Smith also decided to involuntarily transfer Moore and Solomon to a field assignment, based on the significant corrective action recommended by the Review Panel and letters received from Prosecutor Baker

14

requesting that Moore and Solomon be removed from any investigation that may lead to them testifying in Court. Moore and Solomon were transferred to the Patrol Bureau and assigned to South Patrol Division, Watches III and I, respectively. Their pay and benefits remained the same when they were transferred in early 2019.

**Moore Participates in the Review Panel Grievance Process; Brown and Solomon do Not**

Moore exercised her right to review of her recommendation by a grievance panel. The grievance panel was a different group of individuals than the Review Panel. The grievance panel upheld Moore's suspension and transfer.

Brown and Solomon declined to utilize the grievance process.

## II. Additional Facts Related To Individual Plaintiffs

### A. Facts Particularly Related to Moore and Brown's Claims

**Moore and Brown Are Assigned Administrative Duty**

On May 26, 2016, several months after the CAC unit members were suspended and then reassigned, Baker sent a letter to Chief Forte requesting that he remove Moore and Brown "from any position that could possibly result in their service as a police witness on any criminal cases within Jackson County." In June 2016, Chief Forte directed that Moore be removed from her field assignment and placed in an administrative duty role at East Patrol Division taking walk-in reports. Also in 2016, Chief Forte directed that Brown be removed from her field assignment and placed in an administrative duty role at Metro Patrol Division.

**Additional Facts Related to Brown**

Brown worked for the KCPD from 1994 until her retirement in January 2019. Prior to the CAC investigation, she received no disciplinary actions in her twenty-five-year history. Her 2016

15

review was deemed unsatisfactory even though none of the unsatisfactory boxes under traits/skills/abilities were marked.

Brown decided to retire from the Department in the fall of 2018 after receiving the Review Panel's recommendation that she be fired. She decided to retire because a retirement benefits coordinator told her that if she were terminated, her retirement would be in jeopardy, and she did not want to jeopardize her retirement. If she had kept working, her retirement benefits would have increased for each extra year she worked.

Brown made no complaints about discrimination before receiving notice of the recommendation to terminate her employment.

### Additional Facts Related to Moore

Moore started working in the CAC Unit in 2007. She always received satisfactory reviews from her direct supervisors. Since being transferred out of the CAC Unit she has not been disciplined or been subject to any write-ups. In fact, she has received high evaluation reviews. In her twenty-year history with the KCPD, she received only one disciplinary action previously, for a vehicle accident in 2006.

### Moore's Complaint to Human Resources

On January 8, 2019, Moore sent an interdepartmental communication to Human Resources Director Meredith Rund ("Rund"), Sergeant Conrad Stumpenhaus and Sergeant John Beck, complaining of discrimination. Rund investigated Moore's complaint. Rund spoke with Moore, Solomon, and others involved in the CAC Unit investigation. Rund's investigation and report did not find any evidence of discrimination or retaliation against Moore or any other CAC detective.

16

**Moore's View of the Investigation**

Moore alleged the initial investigation was "vindictive" and "disparately" executed, pointing to Sgt. Seward and Maj. Lindaman in particular. Moore believes both were motivated by race and gender in reviewing the CAC detectives' case files, identifying alleged deficiencies, and then communicating the alleged deficiencies up the chain of command.

Moore believes Sgt. Seward was motivated by race and gender because white male counterparts who allegedly had more cases in which no work had been done at all—so there was no specific deficiency to identify—were punished less severely.

Moore bases her belief that Maj. Lindaman was motivated by race and gender with regard to his role in the initial investigation on the following: (1) Sgt. Roy Murry told her CAC squad that Maj. Lindaman does not like "certain people;" (2) Sgt. Roy Murry told her CAC squad that Maj. Lindaman was concerned about how long Brown had been in CAC Unit; (3) Maj. Lindaman brought up race in the statement he gave to IAU detectives; and (4) Sgt. Murry stated to IAU detectives that Maj. Lindaman did not think that Moore and Brown "cared." Moore stated the "certain people" Maj. Lindaman reportedly did not like "were never identified." Moore also noted that Plaintiffs had to endure more and longer interviews as part of the IAU investigation than others.

Sgt. Jennifer Weimhold, who supervised the IAU detectives assigned to this investigation, stated the length of time spent interviewing witnesses was determined by what information the witness had provided and what information the detective needed to obtain. In this investigation, for example, if a lot of cases needed to be vetted, the detective's interview would take longer. Additionally, if the witness had limited knowledge of the subject, the statement would be short.

The length of an interview might also be driven by the volume of information provided by the witness because some witnesses gave longer answers while others gave shorter responses.

Sgt. Weimhold contends that, in this investigation, she met with the detectives routinely and denies that either race or sex was a factor in the interview process. There is no evidence that Plaintiffs' interviews were longer because of their race, age, or sex.

**B.** **Additional Facts Related to Solomon**

**Solomon's History with the KCPD**

Solomon began working for the KCPD in 2004. While in the CAC Unit, Sgt. Hess believed she was performing well enough to be trained as a detective.

Over the course of her employment, Solomon received the following corrective actions before her termination:

| Date | Nature | Corrective Action |
|------|--------|-------------------|
| 11-18-2003 | Inappropriate Comments | Letter of Reprimand |
| 6-14-2007 | Sustained O.C.C. | Letter of Reprimand |
| 8-26-2008 | Failing to Issue Court Date on U.T.T. | Disciplinary Counseling |
| 8-21-2009 | Leaving Patrol Car at Off-Duty Venue Unattended | 2 Days Suspension |
| 2-24-2016 | Failing to Notify Chain of Command of Ex Parte | Letter of Reprimand |
| 1-16-2019 | Miscellaneous Investigation (CAC) | 7 Days Suspension and Involuntary Transfer |

Some of these incidents are described in more detail below.

**Domestic Violence Allegations Resulting In Administrative Duty Assignment**

On January 5, 2016 (which coincidentally is the day after the Miscellaneous Investigation was opened) Chief Forte received a letter from Prosecutor Baker regarding Solomon. Baker

18

wrote that on December 3, 2015, officers were called to Solomon's home on a reported domestic violence assault.  Baker's office declined to file criminal charges against Solomon or her spouse due to insufficient evidence, but determined the matter should be reported to the Department of Social Services to investigate the safety and well-being of three children living in the home. Baker's office concluded that domestic violence had occurred, including verbal altercations that escalated to physical contact that involved hitting, choking, and threats with a loaded handgun. Baker also wrote,

> In addition, I believe you should be aware that if Det. Solomon were to be called as a witness in the future, it is possible, due to the laws of this State, that some or all of the information regarding this and similar events may be used, or attempted to be used, by the defendant to challenge the veracity or legitimacy of Det. Solomon's testimony.  While many factors would ultimately determine the admissibility and potential detrimental impact on the State's ability to successfully prosecute such cases, I believe this matter merited your attention.

Roughly a year later, Baker wrote another letter to Chief Forte regarding Solomon.   In it, Baker stated that "[I]f Officer Solomon is involved in a criminal investigation—in any way, even as a responding patrol officer—I will not prosecute the case."   Baker explained that because she could be called as a witness to testify regarding her interactions with Solomon and because of the CAC investigation, she would recuse herself from any case involving Solomon.   She also wrote, "it has come to my attention that new cases are being submitted to my office where Officer Solomon has had involvement in an investigation even after being removed from the Crime Against Children's Unit.   Naturally, this would create the same conflict of interest that we previously attempted to address."

Chief Forte placed Solomon on administrative duty in early February 2017.

**May 9, 2018, Letter from Baker Concerning Another Domestic Violence Incident Involving Solomon**

On May 9, 2018, Prosecutor Baker sent a letter to Chief Smith raising concerns related to another domestic violence incident involving Solomon, her partner, and their children. This incident occurred on or about January 7, 2018. The letter noted that this was not the first potentially criminal incident between Solomon and her partner. Baker listed three other reports made to KCPD for domestic violence involving the two, and that, prior to the 2018 incident, the prosecutor's office had reviewed criminal charges against Solomon for at least one previous incident of domestic violence with her partner. The letter also referenced Solomon's alleged refusal to provide her child for a forensic interview and otherwise cooperate with the Children's Division investigation into the January 2018 domestic violence episode. Baker's letter concluded, "I am unable to proceed with additional protections for these minor children because the Solomons refuse to cooperate with the investigations."

Baker ultimately declined to charge Solomon. In her letter to Chief Smith, Baker explained that she did not bring charges because mutual combat and evidentiary privileges made the case against Solomon difficult to prove. Baker noted, however, that the matter was "extremely troubling." Baker also advised Chief Smith that she had "Brady obligations which require the disclosure of Officer Solomon's conduct in any potential criminal case she may have played a role [in] for [the] department."

**IAU Miscellaneous Investigation into Solomon**

On June 27, 2018, Chief Smith advised Solomon that he directed the IAU to proceed with a new miscellaneous investigation, a miscellaneous investigation related to the January 7, 2018, incident and criminal investigation. (This miscellaneous investigation was independent of the Miscellaneous Investigation discussed above into the CAC Unit.) Det. Charles Evans of the IAU

20

conducted this miscellaneous investigation. On December 18, 2018, Det. Evans took Solomon's statement.

**Solomon's Human Resources Complaint**

On April 2, 2019, Solomon made a complaint of discrimination and retaliation regarding her disciplinary proceedings related to the domestic violence incident. The KCPD retained an outside investigator to investigate the matter. The investigator sought to interview Solomon, but Solomon, through counsel, declined to provide an interview. The investigator concluded that Solomon's allegations did not establish discrimination, harassment, or retaliation.

**Solomon's Chain of Command Unanimously Recommends her Termination**

Sgt. Jeff Jennings ("Sgt. Jennings") reviewed the miscellaneous investigation file concerning Solomon's January 2018 domestic violence incident and submitted a memorandum to Captain Paul Luster ("Capt. Luster"). Sgt. Jennings recommended that Solomon's employment be terminated due to Solomon's behavior which violated KCPD policies. On April 8, 2019, Capt. Luster submitted his Disciplinary Recommendation, agreeing with Sgt. Jennings that Solomon should be terminated. Deputy Chief Francisco and Chief Smith also recommended termination.

Solomon sought a hearing before the BOPC regarding the recommendation, and on December 3, 2019, the Board held a hearing. Solomon testified and put on evidence.

On February 18, 2020, the BOPC issued its Findings of Fact and Conclusions of Law upholding Solomon's termination. The BOPC found that Officer Solomon's behavior since 2005 reflected a very serious history of poor decision-making despite members of the KCPD spending a lot of time with her trying to address her problems, remedy them, and salvage her. The BOPC also found that "more likely than not that when Solomon left the house [shortly before the January

2018 incident], she left the children, ages 5, 10, and 11, home alone . . . a serious lapse in judgment both by itself and because of the later confrontation [with her spouse that] it precipitated."

The BOPC further found "Solomon's evasive behavior on this issue during the investigation to be intentional and inappropriate."  It found "Solomon chose to kick open the locked bedroom door [in her home], which the Board finds ignited the physical altercation that ensued on January 7, 2018 [between Solomon and her spouse] . . . [and] exhibits exceptionally poor decision-making on the part of Solomon, and is not the standard of conduct required by Department policies."  The BOPC also found that Solomon's conduct was unprofessional on the night of the incident, unprofessional during the criminal investigation, and unprofessional during the Miscellaneous Investigation.   It also found she minimized her actions, attempted to shift blame to others rather than take responsibility for her own actions, her explanations lacked credibility, and her actions discredited and eroded public trust in the KCPD.   The BOPC unanimously recommended terminating her employment.

Solomon argues the BOPC heavily based their findings upon false representations by the detective investigating the 2018 domestic violence episode.   Solomon also contends that white male detectives were treated differently in domestic violence situations.   But she was not able to identify any specific white male detectives who were treated differently.

III.   **EEOC Charges**

On February 12, 2019, Moore, Brown, and Solomon filed discrimination charges with the EEOC, checking the boxes for race, sex, and retaliation.   Moore's charge (and amended charges) reference no adverse actions after her 2019 suspension and transfer.

On July 10, 2019, Solomon filed a charge with the EEOC regarding her termination.

**I.     The BOPC is entitled to summary judgment on all of Brown's claims.**

The BOPC moves for summary judgment on all of Brown's claims against it, arguing she cannot proceed under either Title VII or the ADEA (Counts I, II, and V–VIII) for any allegedly adverse actions taken against her before August 16, 2018, that is, more than 180 days before she filed her EEOC charge on February 12, 2019.   It also argues she cannot proceed on any adverse actions under 42 U.S.C. § 1981 or 42 U.S.C. § 1983 (Counts III and IV) because the statute of limitations has run on these claims.   The BOPC contends that the only timely allegations that remain relate to her recommended termination in October 2018.   And with respect to her termination, she lacks sufficient evidence to make a prima facie case of discrimination or retaliation related to her retirement.   Finally, it contends that even if she could make a prima facie case of pretext, she has no direct evidence of discrimination, and she lacks sufficient evidence of pretext for any claim to survive under the *McDonnell Douglas* burden-shifting framework.

Brown does not dispute the BOPC's arguments concerning timeliness, so these arguments are waived.   *Satcher v. Univ. of Ark. at Pine Bluff Bd. of Trs.*, 558 F.3d 731, 735 (8th Cir. 2009) ("[F]ailure to oppose a basis for summary judgment constitutes waiver of that argument.").   She also does not dispute that her retaliation claim cannot survive summary judgment, so any argument concerning retaliation is waived.   *Id.*   But she contends she has sufficient evidence to make a prima facie case of race, age, and sex discrimination under Title VII and the ADEA related to constructive discharge, and that she can establish pretext.

To make a prima facie case of race, sex, or age discrimination, Brown must show: (1) she is a member of a protected class; (2) she was meeting her employer's legitimate expectations; (3) she suffered an adverse employment action; and (4) "the circumstances give rise to an inference

23

of discrimination (for example, similarly situated employees outside the protected class were treated differently)." *Carter v. Atrium Hosp.*, 997 F.3d 803, 809 (8th Cir. 2021) (race); *see Tenge v. Phillips Mod. Ag Co.*, 446 F.3d 903, 910 (8th Cir. 2006) (sex); *Holmes v. Trinity Health*, 729 F.3d 817, 822 (8th Cir. 2013) (age).

With respect to Brown's discrimination claims, assuming for the sake of argument that her retirement was forced and this constitutes an adverse action, she cannot satisfy the second or fourth elements for a prima facie discrimination claim. As multiple independent reviewers found (Sgt. Seward during the initial "background review," the Review Panel during its investigation, and Prosecutor Baker in her May 26, 2016, letter to Police Chief Forte), there were significant issues concerning Brown's performance, so she was not meeting her employer's legitimate expectations. Indeed, given that there is no evidence here that Baker's assessment of Brown was motivated in any way by discriminatory animus, the May 26 letter is by itself fatal to Brown's discrimination claims. Sgt. Seward's observations and the Review Panel's finding are just corroboration. The fact that Brown had received satisfactory ratings from her immediate supervisor (who was himself disciplined for the CAC Unit's shortcomings after the CAC investigation) is not sufficient evidence that she was meeting her employer's legitimate expectations.

With respect to the fourth element, the circumstances here do not give rise to an inference of discrimination because Brown cannot show she was treated differently than similarly situated Caucasian, male, or younger employees. To justify such an inference, Brown must show she and her comparators engaged "in comparably serious misconduct without experiencing similarly harsh employment consequences." *Carter*, 997 F.3d at 809; *see also Pye v. Nu Aire, Inc.*, 641 F.3d 1011, 1019 (8th Cir. 2011) (holding employees must be "involved in or accused of the same or similar conduct and . . . disciplined in different ways") (internal quotations and citations omitted).

24

But here each detective's actions and circumstances were different, and Brown cannot identify any Caucasian, male, or younger detectives whose actions and circumstances were like hers. For example, Baker indicated she would not prosecute cases with Brown as an investigative detective, but did not articulate concerns about prosecuting cases involving Caucasian or male CAC detectives, so no Caucasian or male CAC detectives are similarly situated to Brown.[6] Thus, Brown cannot "identify anyone else who engaged in the same conduct without any mitigating or distinguishing circumstances." *Bharadwaj v. Mid Dakota Clinic*, 954 F.3d 1130, 1135 (8th Cir. 2020) (internal quotation omitted). Although the Reviewing Panel disciplined other detectives, Baker expressed concerns only about prosecuting cases involving Brown's co-Plaintiffs.

Brown claims that "similarly situated Caucasian or male comparators are former CAC detectives Roubal, Foushee, Harpold, Roetheli, Menuey, and Klug" because they all worked in the CAC Unit during 2014 and 2015, "were all subjected to the CAC Unit investigation," "all at one point had Sergeant Murry as their supervisor," and "all of their cases submitted to the Internal Affairs Unit were subjected to review by the Special Review Panel." Brown's Suggestions in Opp'n at 9, ECF No. 139.

This argument is unavailing. This claim describes the detectives' conduct at too high a level of generality, glossing over the significant differences in each detective's individual situation: it ignores each detective's distinct role in the CAC Unit (for example, a training detective versus a detective who was brand new to the CAC Unit), different tenure in the CAC Unit (for example, one year versus six years), unique caseload, and the severity of the specific conduct involved for each detective. The facts and circumstances involved in disciplining each of the CAC detectives are simply so numerous that no "apples to apples" comparison among them is possible.

---

[6] And the only younger detectives Prosecutor Baker treated similarly were Brown's co-Plaintiffs.

Because Brown cannot establish a prima facie case, the Court need not address the parties' arguments concerning whether she can show pretext under the *McDonnell Douglas* burden-shifting framework.   The BOPC is entitled to summary judgment on all of Brown's claims.

## II.    The BOPC is entitled to summary judgment on all of Moore's claims.

The BOPC moves for summary judgment on all of Moore's claims, arguing she cannot proceed under Title VII (Counts IX, X, and XIII–XIV) for any allegedly adverse actions taken against her more than 180 days before she filed her EEOC charge.   Similarly, she cannot proceed on any adverse actions under § 1981 or § 1983 (Counts XI–XII) because the statute of limitations has run on these claims.   The BOPC contend the only timely allegations that remain relate to her 2019 twelve-day suspension and transfer, and she lacks sufficient evidence to make a prima facie case of discrimination or retaliation related to her suspension and transfer.   Even if she did have such prima facie evidence, her claims fail because she has no direct evidence of discrimination, and her claims cannot survive under the *McDonnell Douglas* burden-shifting framework because she lacks sufficient evidence of pretext.

Like Brown, Moore does not dispute the BOPC's arguments concerning timeliness, so these arguments are waived.   *See Satcher*, 558 F.3d at 735.   And, like Brown, Moore does not dispute that her retaliation claim cannot survive summary judgment, so any argument concerning retaliation is waived.   *Id*.   But she contends she has sufficient evidence to make a prima facie case of race and sex discrimination related to her 2019 suspension and transfer, and that she can establish pretext.

Like Brown, Moore lacks evidence to satisfy the second and fourth elements of a prima facie discrimination claim.   With respect to the second element, multiple reviewers—Sgt. Seward, the Review Panel, and Prosecutor Baker—found significant issues concerning Moore's

26

performance which amply demonstrate she was not meeting her employer's legitimate expectations. The fact Moore generally received average performance ratings prior to the CAC investigation is unavailing considering this other evidence and the fact that the supervisor who gave her the satisfactory ratings was himself disciplined after the CAC Unit investigation.

With respect to the fourth element, the circumstances here do not give rise to an inference of discrimination because Moore cannot show she was treated differently than similarly situated Caucasian or male employees. Each detective's actions and circumstances were different, and Moore cannot identify any Caucasian or male detectives whose actions and circumstances were like hers. For example, Prosecutor Baker did not articulate concerns about prosecuting cases involving Caucasian or male CAC detectives, but indicated she would not prosecute cases with Moore as an investigating detective, so no Caucasian or male CAC detectives are similarly situated to Moore. Moore cannot "identify anyone else who engaged in the same conduct without any mitigating or distinguishing circumstances." *Bharadwaj*, 954 F.3d at 1135. Thus, there are no other Caucasian or male comparators here.

Like Brown, Moore claims that "similarly situated Caucasian or male comparators are former CAC detectives Roubal, Foushee, Harpold, Roetheli, Menuey, and Klug" because they all worked in the CAC Unit during 2014 and 2015, "were all subjected to the CAC Unit investigation," "all at one point had Sergeant Murry as their supervisor," and "all of their cases submitted to the Internal Affairs Unit were subjected to review by the Special Review Panel." Moore's Suggestions in Opp'n at 8, ECF No. 140.

This argument is unavailing. As discussed above, this argument describes the detectives' conduct at too high a level of generality, ignoring differences in each detective's role, tenure, and caseload, as well as the severity of each detective's conduct. The unique facts and circumstances

27

for each detective are such that no "apples to apples" comparison between them is possible.

Because Moore cannot establish a prima facie case, the Court need not address the parties' arguments concerning whether she can show pretext under the *McDonnell Douglas* burden-shifting framework. The BOPC is entitled to summary judgment on all of Moore's claims.

### III. The BOPC is entitled to summary judgment on all of Solomon's claims.

The BOPC moves for summary judgment on all of Solomon's claims, arguing she cannot proceed under Title VII (Counts XV–XVI, XIX–XX) for any allegedly adverse actions taken against her more than 180 days before she filed her EEOC charge. Similarly, she cannot proceed on any adverse actions under § 1981 or § 1983 (Counts XVII–XVIII) because the statute of limitations has run on these claims. The BOPC contends the only timely allegations that remain relate to her seven-day suspension, transfer, and subsequent termination, and she lacks sufficient evidence to make a prima facie case of discrimination or retaliation on these allegations. Even if she did have such prima facie evidence, her claims fail because she has no direct evidence of discrimination or retaliation, and her claims cannot survive under the *McDonnell Douglas* burden-shifting framework because she lacks sufficient evidence of pretext for discrimination or retaliation.

Solomon does not dispute the BOPC's arguments concerning timeliness or that she lacks direct evidence of discrimination or retaliation, so these arguments are waived. *Satcher*, 558 F.3d at 735. But she contends she has sufficient evidence to make a prima facie case of race discrimination, sex discrimination, and retaliation, and that she can prove pretext.

#### A. Solomon cannot establish a prima-facie case of discrimination.

Like her co-Plaintiffs, Solomon lacks evidence to satisfy the second and fourth elements of a discrimination claim. With respect to the second element, Solomon cannot show she was

28

meeting her employer's legitimate expectations when she was suspended and transferred because, as noted by Sgt. Seward, the Review Panel, and Prosecutor Baker, there were significant issues with Solomon's performance.

The undisputed material facts here also do not satisfy the fourth element—that the circumstances give rise to an inference of discrimination—because Solomon cannot show she was treated differently than similarly-situated Caucasian or male employees. To allow such an inference, Solomon must show that she and her comparators engaged "in comparably serious misconduct without experiencing similarly harsh employment consequences." *Carter*, 997 F.3d at 809; *see also Pye*, 641 F.3d at 1019 (holding employees must be "involved in or accused of the same or similar conduct and . . . disciplined in different ways"). But each detective's actions and circumstances were different, and Solomon cannot identify any Caucasian or male detectives whose actions and circumstances were like hers. For example, Prosecutor Baker indicated she would not prosecute cases with Solomon as an investigating detective, but did not articulate concerns about prosecuting cases involving Caucasian or male CAC detectives, so no Caucasian or male CAC detectives are similarly situated to her. Thus, Solomon cannot "identify anyone else who engaged in the same conduct without any mitigating or distinguishing circumstances." *Bharadwaj*, 954 F.3d at 1135.

Solomon claims that "similarly situated Caucasian or male comparators are former CAC detectives Roubal, Foushee, Harpold, Roetheli, Menuey, and Klug" because they all worked in the CAC Unit during 2014 and 2015, "were all subjected to the CAC Unit investigation," "all at one point had Sergeant Murry as their supervisor," and "all of their cases submitted to the Internal Affairs Unit were subjected to review by the Special Review Panel." Solomon's Suggestions in Opp'n at 10, ECF No. 141. This argument is unavailing. As discussed above, this argument

describes the detectives' conduct at too high a level of generality, ignoring differences in each detective's role, tenure, and caseload, as well as the severity of each detective's conduct. The unique facts and circumstances for each detective are such that no "apples to apples" comparison between them is possible.

Solomon also claims that former Detective Eric DeValkenaere is a similarly situated Caucasian or male comparator because he was a detective accused of committing a criminal offense. Solomon's Suggestions in Opp'n at 16, ECF No. 141. This argument is meritless. It is well-established employees are not similarly situated when their misconduct differs. *Findlator v. Allina Health Clinics*, 960 F.3d 512, 515–16 (8th Cir. 2020). The facts and circumstances of DeValkenaere's case are wildly different than Solomon's. DeValkenaere shot a suspect while on duty after a car chase through a residential neighborhood. Solomon was repeatedly involved in domestic violence situations while off-duty and, in the most recent incident, accused of failing to cooperate with the subsequent investigation. The only similarity between the two is that both are KCPD detectives alleged to have committed criminal misconduct. This is not enough to make them comparators.

### B. Solomon cannot establish a prima facie case of retaliation.

To make a prima facie case of retaliation in violation of Title VII, Solomon must show: "(1) she engaged in protected conduct, (2) she suffered a materially adverse employment action, and (3) the adverse action was causally linked to the protected conduct." *Watson v. McDonough*, 996 F.3d 850, 856 (8th Cir. 2021). To establish causation, Solomon "must prove the desire to retaliate was the but for cause of her termination—that is, that the unlawful retaliation would not have occurred in the absence of the alleged wrongful action or actions of her employer." *Wright v. St. Vincent Health Sys.*, 730 F.3d 732, 737 (8th Cir. 2013).

30

In this case, while the timeline here makes retaliation a temporal possibility—Solomon filed an EEOC complaint alleging discrimination on February 12, 2019, and Capt. Luster recommended she be fired on April 8, 2019—there is no evidence that tends to show her making a complaint led to her subsequent firing. Temporal proximity by itself is not enough to show causation. The relevant Eighth Circuit caselaw discussing a prima facie case always contains at least some evidence linking the adverse action to the employee's protected conduct. *See, e.g.*, *Sayger v. Riceland Foods, Inc.*, 735 F.3d 1025, 1032 (8th Cir. 2013) (affirming plaintiff's verdict, noting there was evidence that prior to plaintiff's dismissal, a supervisor had talked about "troublemakers" being gone, and there was evidence linking complaints by other employees to subsequent terminations or disciplinary action).

Here there is no evidence indicating Solomon would not have been fired "but for" her complaining. On the contrary, the record demonstrates Solomon was terminated because she had a history of poor decision-making and the KCPD had come to view her as an unsalvageable employee. In fact, Solomon's termination was effectively set in motion in January 2016—well before she made her complaint—when Prosecutor Baker sent Chief Smith her first letter outlining concerns about Solomon's involvement in a suspected domestic violence episode, the first of several such letters complaining about Solomon.

Prosecutor Baker's May 9, 2018, letter, which was also sent before Solomon complained about discrimination, noted the January 2018 incident was the fourth such episode involving Solomon and her partner. This letter also alleged that Solomon had refused to cooperate with the subsequent criminal investigation into the January incident. Baker concluded by advising Chief Smith that pursuant to her obligations under *Brady v. Maryland*, her office would have to disclose Solomon's conduct in any potential criminal case in which she played a role for the department,

31

making it difficult to successfully prosecute cases in which she played a substantive role. The subsequent IAU investigation into the January 2018 incident and the chain of command's (Sgt. Jennings, Capt. Luster, Deputy Chief Francisco, Chief Smith, and the entire Board of Police Commissioners) unanimous recommendation that Solomon should be terminated buttresses the conclusion that Solomon was not fit to be a detective. This conclusion is also consistent with Solomon's checkered disciplinary record, which years before the CAC investigation occurred contained two letters of reprimand, disciplinary counseling, and a two-day suspension. Thus, Solomon cannot establish the third element of a prima facie claim for retaliation.

Consequently, the BOPC is entitled to summary judgment on all of Solomon's claims.

## Conclusion

For the reasons set forth above, the BOPC's motions for summary judgment, ECF Nos. 122–124, are GRANTED.

**IT IS SO ORDERED.**

Date:  January 17, 2024        /s/ Greg Kays
                               GREG KAYS, JUDGE
                               UNITED STATES DISTRICT COURT